# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

KYLE J. PITKIN,

    Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

No. C08-4049-PAZ

**MEMORANDUM OPINION AND ORDER**

_____

This matter is before the court for judicial review of the defendant's decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The plaintiff Kyle J. Pitkin was found to be disabled as of August 23, 1996, due to a mental impairment (schizophrenia) that met Listing 12.03. On March 24, 2000, he was found not to be disabled any longer due to improvement in his condition that made it possible for him to perform simple, routine work activities. On March 29, 2004, Pitkin filed the application for benefits currently under review, alleging his disability had never abated, and he had been disabled since August 23, 1996. His claim was denied initially and on reconsideration. He had a hearing before an Administrative Law Judge ("ALJ") on May 8, 2006. "In order to avoid an unadjudicated period," the ALJ considered Pitkin's application for "the period from March 25, 2000, the day after [his] disability was found to cease, through the date last insured, June 30, 2001." A.R. 17. On November 17, 2006, the ALJ issued his decision, finding that although Pitkin has no past relevant work, but he had the functional capacity to work, and he therefore was not disabled at any time from March 25, 2000, to his date last insured of June 30, 2001.

Pitkin filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. He argues the ALJ erred in failing to find that his impairment continued to meet

Listing 12.03 throughout the period in question, and in failing to evaluate the record evidence properly. *See* Doc. No. 11. On July 17, 2008, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Pitkin was born in September 1974, making him thirty-two years old at the time of the ALJ hearing. He graduated from high school and went into the Army, serving from November 1994 to February 1995. He was discharged "Under Honorable Conditions." *See, e.g.*, A.R. 507. He then served in the Navy from March 1996 to September 1996. He received an Honorable Discharge from the Navy due to service-connected, Gulf-War-incurred, mental and physical impairments (i.e., schizophrenia, and patellofemoral syndrome of the right knee). He was found by the Department of Veterans Affairs to be incompetent and 100% disabled from September 14, 1996, the day following his discharge from the Navy.

The Social Security Administration determined Pitkin to be disabled as of August 23, 1996, because his schizophrenia met Listing 12.03. When a claimant's impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled regardless of age, education, or work experience. Listing 12.03 provides as follows:

**12.03** *Schizophrenic, Paranoid and Other Psychotic Disorders:* Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one or more of the following:
 1. Delusions or hallucinations; or
 2. Catatonic or other grossly disorganized behavior; or
 3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
  a. Blunt affect; or
  b. Flat affect; or
  c. Inappropriate affect;
 or
 4. Emotional withdrawal and/or isolation;
AND
B. Resulting in at least two of the following:
 1. Marked restriction of activities of daily living; or
 2. marked difficulties in maintaining social functioning; or
 3. marked difficulties in maintaining concentration, persistence, or pace; or
 4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
 1. Repeated episodes of decompensation, each of extended duration; or
 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.03 ("Listing 12.03").

Pitkin has little earnings history other than his terms in the military. The record indicates he had only one job, as a yard loader at a lumber company, for a period of about six months in 1996. During the fall of 1999, he was noted to be doing physical workouts, dating, staying sober and attending recovery meetings, and socializing with others in recovery.[1] *See* A.R. 196. He took some college courses during the 1999-2000 term. On March 24, 2000, Pitkin was found to have improved to the point that he was able "to perform a wide range of more simple and routine work activities." He therefore was found not to be disabled any longer, and his Social Security disability insurance and supplemental security income benefits ceased. *See* R. 17; Doc. No. 11, p. 3.

In April 2000, Pitkin reduced his medication dosage despite his doctor's contrary recommendation. *See* A.R. 189, 190. Thereafter, he missed several appointments with his therapist, and by September 18, 2000, he was noted to be "off all medications." He was working out at a gym to help control his anxiety, and he expressed a desire to remain off all medications due to a belief that the medications interfered with his ability to perform his regular activities. A.R. 187, 188.

On May 5, 2000, Pitkin underwent a disability examined by the Department of Veterans Affairs ("V.A.") for re-evaluation of his schizophrenia and competency to handle funds. He exhibited disorganized thoughts and behaviors and admitted to having some auditory hallucinations. He expressed the belief that his doctors wanted to hospitalize him so they could experiment on him, and that his apartment manager was trying to make him

---

[1] The ALJ noted Pitkin "reported periods of substance abuse through the years, but indicated that he did not have any difficulties with substance abuse between 2000 and 2003 and he [had] been sober for three years [at the time of the ALJ hearing]." A.R. 22. It does not appear that substance abuse is an issue in the case, and the ALJ performed no analysis of the effect of any substance abuse on Pitkin's ability to function.

sick. Although the V.A. examiner found that Pitkin's schizophrenia had improved somewhat, his assessment of 100% disability was continued. The evaluator noted that for purposes of V.A. disability,

> [a]n evaluation of 100 percent is assigned whenever there is evidence of total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

A.R. 531. Notes indicate Pitkin's schizophrenia was not severe enough to require the assistance of another person to perform the basic activities of daily living, and he was not substantially confined to his home and needed no special protection from hazards or dangers incident to his daily environment. *Id*. He was found to be "competent for VA purposes," such that he was able to manage his personal affairs. A.R. 532.

The record indicates Pitkin remained off his medications, but by October 2000, he was still struggling with anxiety. *See* R. 186. By December 2000, Pitkin "had become disorganized in this thinking and his behavior and an acquaintance filed for commitment and [Pitkin] was ordered to the hospital by the court." A.R. 255. He was hospitalized for eight days. On admission, he was noted to be "quite tense," with an abnormal affect and rambling speech. He was unwilling to take medications that were offered to him, stating medications always made him worse. He began having some delusions, stating his grandmother was negotiating an NFL contract for him to play pro football (notes indicate he had no outstanding football skills). After the doctor called Pitkin's grandmother, Pitkin agreed to take a Haloperidol injection once a month. Pitkin apparently was unable to return to his apartment because of behavior problems there, but notes indicate he had funds and believed he could find another suitable apartment. He was discharged with a diagnosis of "Schizophrenia paranoid chronic" and a GAF of 41, and he was noted to be disabled

due to chronic mental illness. His prognosis was noted to be dependent on his willingness to follow his medication regimen. (A.R. 255-56)

There is no further evidence in the record regarding Pitkin's condition or treatment prior to his date last insured of June 30, 2001. Additional evidence from the spring of 2002, through April 2006, indicates Pitkin continued to be regarded by the V.A. as 100% disabled from his schizophrenia. He was hospitalized again in June 2003, for psychiatric treatment, and he was transferred to the V.A. Hospital, where he remained until January 2004. By March 2004, his condition was noted to be greatly improved on his current medications, with more energy, less sedation, and no hallucinations or psychoses. Pitkin's condition had deteriorated somewhat by November 2004, when he was noted to have increased anxiety and auditory hallucinations, and he exhibited repetitive, obsessive speech patterns.

On April 5, 2006, Pitkin underwent a psychodiagnostic mental status exam by Michael P. Baker, Ph.D. at the request of the state agency. Dr. Baker reviewed the significant volume of Pitkin's past medical records incident to his evaluation of Pitkin. Pitkin appeared for the evaluation dressed appropriately with good hygiene, good eye contact, articulate speech with no looseness of association, and well-directed, logical thoughts. He stated that he attended two AA meetings per week and had two years of sobriety. He drove a car, did his own housework and grocery shopping, and engaged in physical workouts almost daily. He indicated he planned to return to school in the summer, and "hope[d] in the future perhaps to work as a personal trainer, drug and alcohol counselor, or something to do with psychology." A.R. 561. Overall, he presented himself "in a rather positive fashion." A.R. 562.

However, Pitkin did poorly in solving mathematical problems, and he denied ever having auditory hallucinations, something that is negated by the record. He had returned to living with his mother "to minimize external stressors apparently in order to function

as stably as he is presently." *Id*. Dr. Baker noted Pitkin had experienced "repeated episodes of decompensation in the past.

Regarding Pitkin's mental functional limitations, Dr. Baker found as follows:

> [Pitkin's] present functioning is such that he seems to be able to remember and understand instructions, procedures and locations. He also seems able to carry out instructions calling for necessary maintenance of attention, concentration, and pace. However, with a normal work day of eight hours and work week, certainly dependent on the amount of stress and the demands presented, his history would indicate this not being a likely scenario. He has involved himself recently with Voc Rehab and it will be important to gain supervised work evaluation. Demands of social interaction and stressors related to changes in the workplace by history are likely to affect judgment.

A.R. 563. Dr. Baker diagnosed Pitkin with Schizophrenia, disorganized type versus chronic paranoid type; polysubstance dependence in sustained full remission; and occupational problems affected by chronic mental illness, with a current GAF of 50. *Id*.

At the ALJ hearing, the Vocational Expert was asked to consider an individual of Pitkin's age and with Pitkin's education and past relevant work history, with no limitations on his physical functional abilities, but the following limitations on his mental functional abilities: slight problems in remembering and carrying out detailed instructions, and with making judgments about simple work-related decisions; and moderate problems working with the public, interacting appropriately with supervisors and coworkers, and responding appropriately to work pressures or changes in the routine work setting. The VE indicated the individual would be able to return to Pitkin's past work at the lumber yard, both as Pitkin performed it and as the job is performed in the regional economy. The VE further indicated the individual would be able to perform other jobs such as production assembler, machine packager, and hand packager, all of which are unskilled jobs. A.R. 653-54.

The VE stated if the individual could not complete an eight-hour work day, then he would be unemployable. A.R. 655. If the individual had "gross impairment in thought

7

processes or communication, persistent . . . delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others, intermittent inability to perform activities of daily living, disorientation to time or place, memory loss o[f] names of close relatives, or an occupation, or own name," then he also would be unable to work. A.R. 656.

The ALJ found Pitkin's schizophrenia to be a severe impairment, but found the impairment did not meet or equal a Listed impairment from March 25, 2000, when Pitkin's benefits were terminated, through his date last insured of June 30, 2001. The ALJ found that Pitkin had no past relevant work, but he would be able to perform a number of unskilled jobs. He therefore ruled that Pitkin was not disabled at any time from March 25, 2000, through June 30, 2001.

The ALJ found Pitkin not to be fully credible, noting that "observations and remarks from treating sources would lead one to reasonably conclude that [Pitkin] was able to function when compliant with his medication regimen." A.R. 23. The ALJ reached this conclusion without considering whether Pitkin's failure to comply with his medication regimen was a result of his schizophrenia. "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, ___ F.3d ___, No. 07-3561 (8th Cir., May 6, 2009) (internal quotation marks, citations omitted). The ALJ noted that on several occasions, Pitkin's treating sources explained to him that he needed to take his medications, but Pitkin indicated he felt worse on the medications and believed they prevented him from functioning normally. The ALJ "failed to make the critical distinction between [Pitkin's] awareness of the need to take [his] medication and the question whether [his] noncompliance with [his] medication was a medically-determinable symptom of [his] mental illness." *Id*.

8

Even when Pitkin was committed involuntarily to the hospital, he refused medications until doctors talked with his grandmother and confirmed that Pitkin was delusional. Clearly, his refusal to comply with his medication regimen was attributable to his mental illness. "Someone who is truly paranoid or who is hallucinating, someone who may well believe that doctors 'are out to get him' for no good reason is unlikely to accept treatment prescribed by doctors. To deny this person benefits for this reason, because he is not acting under a 'reasonable fear' mocks the idea of disability based on mental impairments." *Benedict v. Heckler*, 593 F. Supp. 755, 761 (E.D.N.Y. 1984); *accord, Pate-Fires, supra*.

The record does not contain substantial evidence to support the ALJ's decision. Even the ALJ's own description of Pitkin's condition depicts an individual with severe mental illness. *See* A.R. 20. Indeed, the court questions the March 25, 2000, termination of benefits. Although Pitkin's condition improved for brief periods of time, sometimes even up to a few months at a time, the record contains substantial evidence that his condition met, and continues to meet, the requirements of Listing 12.03(C). His psychotic disorder has existed for more than two years. It has caused more than a minimal limitation in his ability to do basic work activities. His symptoms are at times, but not always, attenuated by medication or psychosocial support. His history includes repeated episodes of decompensation, each of extended duration. And his "residual disease process . . . has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [him] to decompensate[.]" Listing 12.03(C).

The fact that Pitkin's condition improves for periods of time, and even that he might be able to work at times, is not fatal to his claim. In *Pagan v. Bowen*, 862 F.2d 340 (D.C. Cir. 1989), the court explained:

> The cases show that symptoms can be greatly reduced in severity without interrupting an "impairment." Indeed, they agree that the existence of an impairment is not necessarily

9

> negated even when an individual becomes stable enough to hold down a job for a limited period of time. *Poulin v. Bowen*, 817 F2d [865,] at 868, 876 (D.C. Cir. 1987)] (claimant worked continuously for eleven months); *Singletary v. Bowen*, 798 F.2d [818,] at 820-21 [(5th Cir. 1986)] (claimant was sporadically employed); *McGee v. Bowen*, 647 F. Supp. [1238,] at 1242, 1251 [(N.D. Ill. 1986)] (claimant worked continuously for three-quarters of a year); *Morrone v. Secretary of Health, Education & Welfare*, 372 F. Supp. [794,] at 801 [(E.D. Pa. 1974)] (claimant worked continuously for more than six months). As this court has stated:
>
>> Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.
>
> *Poulin*, 817 F.2d at 875. . . .

*Pagan*, 862 F.3d at 350. The evidence of record supports the conclusion that any periods of improvement in Pitkin's condition have been "of uncertain duration and marked by an impending possibility of relapse," and "his ability to work may be sporadically interrupted by unforeseeable mental setbacks." *Id*.

Even if Pitkin's impairment did not meet Listing 12.03(C), the record does not contain substantial evidence to support the ALJ's conclusion that Pitkin is able to perform substantial gainful activity, or that he was able to work prior to and since his date last insured. "The appropriate test to determine whether a claimant who has a severe mental impairment but not a listed impairment is disabled by the mental impairment is whether the mental impairment is of such severity that plaintiff cannot, or could not on his last eligibility date, engage in any substantial gainful employment." *Wheeler v. Sullivan*, 888 F.2d 1233, 1238 (8th Cir. 1989) (citations, internal quotation marks omitted). The record indicates, as the ALJ noted, that in May 2000, Pitkin "continued to report auditory

hallucinations, and he exhibited loose associations . . . as well as disorganized thoughts and behaviors." A.R. 20. Thereafter, he continued to experience extended periods of decompensation, and in 2006, the state agency consultant indicated it was unlikely Pitkin could complete a normal eight-hour work day and work week. Pitkin is the epitome of the type of individual described by the *Pagan* court. "[T]he medical evidence uniformly indicates [the claimant] suffers from a severe mental impairment and cannot be expected to engage in any gainful employment." *Pate-Fires, supra*.

The court finds the record does not contain substantial evidence to support the denial of benefits, and contains overwhelming support for an immediate award of benefits. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (on judicial review, if court finds denial of benefits was improper, court "may enter an immediate finding of disability only if the record 'overwhelmingly supports' such a finding") (citations omitted). Accordingly, the Commissioner's decision is **reversed**, and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g), for a finding that Pitkin has been disabled continuously since August 23, 1996.

**IT IS SO ORDERED.**

**DATED** this 6th day of May, 2009.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT